NO. 25-10665

IN THE
UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

_____

BLF LAND, L.L.C ; BLAINE LARSEN FARMS, INCORPORATED

*Plaintiffs / Appellants,*

V.

NORTH PLAINS GROUNDWATER CONSERVATION DISTRICT,

*Defendant / Appellee.*

*Appealed from Cause No. 2:23-CV-00133; United States district court*
*Northern District of Texas, Amarillo Division*
*The Honorable, Matthew J. Kacsmaryk, presiding*

_____

**BRIEF OF APPELLANTS**
**BLF LAND, LLC AND BLAINE LARSEN FARMS, INC.**
_____

Marvin W. Jones, SBN 10929100
C. Brantley Jones; SBN: 24079808
SPROUSE SHRADER SMITH PLLC
P.O. Box 15008
Amarillo, Texas 79105-5008
(806) 468-3300 phone
(806) 373-3454 fax
marty.jones@sprouselaw.com
brantley.jones@sprouselaw.com

***Attorneys for Appellants, BLF Land, Inc.***
***and Blaine Larsen Farms, Inc.***

**ORAL ARGUMENT REQUESTED**

## I.     CERTIFICATE OF INTERESTED PERSONS
### CASE NO. 25-10665

(1)     No. 25-10665, BLF Land, LLC; Blain Larsen Farms, Inc. v. North Plains Groundwater Conservation District. USDC No. 2:23-CV-00133

(2)     The undersigned counsel of record certifies pursuant to Fifth Circuit Rule 28.2.1 that the following listed persons and private entities have an interest in the outcome of this case, including all private practice lawyers and private law firms currently engaged in this litigation. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

1) <u>Plaintiffs-Appellants</u>:
   BLF Land, LLC and Blaine Larsen Farms, Inc.

2) <u>Defendant-Appellee</u>:
   North Plains Groundwater Conservation District

3) <u>Counsel for Plaintiffs-Appellants</u>:
   Marvin W. Jones, Sprouse Shrader Smith PLLC
   C. Brantley Jones, Sprouse Shrader Smith PLLC

4) <u>Counsel for Defendant-Appellee</u>:
   Deborah C. Trejo, Kemp Smith LLP
   Ancel Escobar, Kemp Smith LLP
   Thomas C. Riney, Underwood Law Firm, PC
   Jason Fenton, Underwood Lw Firm, PC

Respectfully Submitted


/s/ *Marvin W. Jones*
Marvin W. Jones
Attorney of Record for Appellants

i

## II.    <u>STATEMENT REGARDING ORAL ARGUMENT</u>

This appeal involves nuanced issues of state law, an extensive record, and the science of hydrology. Plaintiffs-Appellants believe that Oral Argument would significantly aid the Court's decisional process.

## III.   <u>**TABLE OF CONTENTS**</u>

I.        CERTIFICATE OF INTERESTED PERSONS ..........................................i

II.       STATEMENT REGARDING ORAL ARGUMENT. ............................ ii

III.      TABLE OF CONTENTS .......................................................... iii

IV.       TABLE OF AUTHORITIES ......................................................v

V.        JURISDICTIONAL STATEMENT ...........................................1

VI.       ISSUES PRESENTED ...............................................................2

VII.      STATEMENT OF THE CASE ..................................................2

VIII.     SUMMARY OF THE ARGUMENT ........................................6

IX.       ARGUMENT..............................................................................8

    A. Standard of Review  ...........................................................8

    B. The district court erred by granting summary judgment to NPGCD on Larsen's
    *ultra vires* claim ...................................................................9
      a.  The GPU Rule ...............................................................9
      b.  NPGCD is not statutorily authorized to regulate groundwater production by
      Dictating the geometric and spatial limitations of private property  ..12
      c.  The district court improperly weighed expert testimony to determine that the
      GPU Rule fulfils the District's statutory purposes .............................18

    C. The district court erred by granting summary judgment to the District on Larsen's takings claim ...........................................................24
      a.   Per se taking ...............................................................24
      b.   Regulatory Taking  ......................................................32

    D. The district court erred in finding that the District did not violate Larsen's due
    process rights ............................................................................39

      a. Procedural Due Process ......................................................40

      b. Substantive due process ....................................................43

X.      CONCLUSION AND PRAYER ...............................................46

XI.     CERTIFICATE OF SERVICE.................................................47

XII.    CERTIFICATE OF COMPLIANCE .......................................48

# IV.    TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) .................................... 9

*Builder Recovery Servs., LLC v. Town of Westlake*, 650 S.W.3d 499, 503
(Tex. 2022)…………………………………………………………………………..17

*Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986)………………………….………8

*Cleveland Bd.  of Educ. v. Loudermill*, 470 U.S. 5322, 542 (1985)………..……..41

*Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d  528, 533 (5th Cir. 1997)…..….…8

*Edwards Aquifer Auth. v. Bragg*, 421 S.W.3d 118, 141
(Tex.App.—San Antonio 2013, pet. denied)………………………..………………34

*Edward's Aquifer Auth. v. Day*, 369 S.W.3d at 840……………………….33, 34, 38

*Edward's Aquifer Auth. v. Day*, 369 S.W.3d at 830………………………………25

*Edward's Aquifer Auth. v. Day*, 369 S.W.3d 814, 817 (Tex. 2012)………………25

*Edward's Aquifer Auth. v. Day,* 369 S.W.3d at 843………………………………25

*Foster v. Waco*, 225 S.W. 1104, 1106 (Tex. 1923)……………………….………18

*FM Props. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996)
(quoting *Village of Euclid v. Amber Realty Co.*, 272 U.S. 365, 395 (1926))……..44

*Guitar Holding Co., L.P. v. CL Mach. Co.*, 209 S.W.3d 146, 154 (Tex.App.—El
Paso 2006), rev'd on other grounds, 263 S.W.3d 910 (Tex. 2008)………….…..14

*Lingle v. Chevron U.S.A., Inc.*, 544 U.S 528, 549 (2005) (Kennedy, J
concurring)…………………………………………………………….…..44

*Madden v. Tex. Bd. of Chiropractic Examiners*, 663 S.W.2d 622, 626
(Tex.App.—Austin 1983, writ ref'd n.r.e.)(citing *Morgan v. United States*,
304 U.S. 1, 18-19 (1938))……………………………………………………..41, 42

*Marrs v. Railroad* Commission…………………………………………………7

*Marrs v. RRC*, 177 S.W.2d 941, 948 (Tex.1944)…………………………..……..24

*Marrs*, 177 S.W.2d at 943………………………………………..…..……………26

*Marrs*, 177 S.W.2d at 949………………………………………..…..……………27

*Marrs*, 177 S.W.2d at 945 ........................................................................................27

*Marrs*, 177 S.W.2d at 946 , 947, 48 ........................................................................27

*Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001)
(O'Connor, J. , concurring) .............................................................................. 32-33

*Palazzolo v. Rhode Island*, 533 U.S. 606, 627-30 (2001) ...........................35, 36, 37

*Palazzolo v. Rhode Island*, 533 U.S. 614-615 (2001) ....................................... 35-36

*Palazzolo v. Rhode Island*, 533 U.S. at 634 (O'Connor, J., concurring) ...............34

*Palazzolo*, 746 A.2d 707, 717 (R.I. 2000) ...............................................................36

*Penn Central Transp. Co. v. New York* City, 438 U.S. 104 (1978) .........................32

*Penn* Central *Transp. Co. v. New York* City, 438 U.S. at 124 ...................................35

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ..................9

*Seigler v. Wal-Mart Stores Tex.*, 30 F.4th 472, 476-77 (5th Cir. 2022) ....................21

*Simi Inv. CO. v. Harris Cty.*, 236 F.3d 240, 249 (5th Cir. 2000) ..............................44

*Simi Inv. CO. v. Harris Cty.*, 236 F.3d 251 (5th Cir. 2000) .......................................44

*South Plains Lamesa*, 52 S.W.3d at 782 (Quinn, J. concurring) ............................42

*South Plains Lamesa R.R., Ltd. v. High Plains Underground Water Conserv. Dist.*

*No. 1.*, 52 S.W.3d 770, 779 (Tex.App.—Amarillo 2001, no pet.) .........................12

*Stratta v. Roe*, 961 F.3d 340, 359 (5ᵗʰ Cir 2020) *citing Edward's Aquifer Auth. v. Day*, 369 S.W.3d 814, 817 (Tex. 2012) ...........................................................................25

*Stratta v. Roe*, 961 F.3d at 360 .........................................................................25

*Tango Transp. v. Healthcare Fin. Servs. LLC*, 322 F.3d 888, 890 (5ᵗʰ Cir. 2003) ....8

*Tri-City Fresh Water Supply Dist. No. 2 v. Mann*, 142 S.W.2d 945, 948 (Tex. 1940) ...........................................................................................................12

*Wal-Mart Stores Tex.*, 30 F.4ᵗʰ 472, 476-77 (5ᵗʰ Cir. 2022) .....................................24

## STATUTES & CODES
29 U.S.C. § 1291 .............................................................................................1

Tex. Spec. Dist. Loc. Laws Code § 8887.104 .........................................................14

Tex. Spec. Dist. Loc. Laws Code § 8887.101 .........................................................14

Tex. Water Code § 36.0015(b) .............................................................................3

Tex Water Code § 36.101(a) ...............................................................................15

Tex Water Code § 36.116(a) ...........................................................................15,18

Tex Water Code § 36.116(e) ...........................................................................15,16

Tex. Water Code Section 36.116(a)(2)(B) ..............................................................16

Tex. Water Code § 36.116(a)(2) .....................................................................15,18

Tex. Water Code Sec. 36.108(d) ..........................................................................20

## RULES
NPCGD District Rules 3.1 3.10.............................................................................3

NPCGD District Rule 7.5 ...................................................................3, 10

NPCGD District Rule 7.6 ...................................................................3, 10

NPCGD District Rule 7.3 .......................................................................3

NPCGD Fed. R. Civ. P. 56(a) .................................................................8

NPCGD Fed. R. Civ. P. 54(b) ...........................................................39, 44

**OTHER AUTHORITIES**

www.twdb.texas.gov/groundwater/conservation_districts/facts.asp ........................2

# V.     <u>JURISDICTIONAL STATEMENT</u>

This Court has jurisdiction over this appeal pursuant to 29 U.S.C. § 1291 because the judgment below is a final judgment of the United States district court.[1]

# VI.     <u>ISSUES PRESENTED</u>

1. The trial court erred in rendering summary judgment on Appellants' *ultra vires* claims because it employed an overly expansive interpretation of a groundwater conservation district's authority under the Texas Water Code, and because the trial court resolved extant issues of material fact by weighing or disregarding competing summary judgment evidence.

2. Appellants alleged *per se* and regulatory claims. In rendering summary judgment in favor of Appellees on each of those claims, the court erroneously resolved issues of material fact raised by competing summary judgment evidence and misapplied the three factor *Penn Central* test in evaluating Appellants' regulatory takings claim.

3. Appellees violated Appellants' procedural and substantive due process rights where Appellees: denied Appellants meaningful notice of the issues that would control the resolution of Appellants application for a variance from Appellee's rules; damaged Appellants' interests in their real property through the application of rules that fail to rationally relate to statutory purposes for

---

[1] ROA.6955

which a groundwater conservation district may regulate. The trial court erred in granting summary judgment on Appellants' procedural and due process claims because it found a standardless variance procedure to be constitutionally sufficient and weighed competing evidence regarding the relationship between Appellees' rules and their statutory authority.

## VII.    STATEMENT OF THE CASE

Appellants BLF Land, LLC and Blaine Larsen Farms, Inc. (collectively, Larsen) operate a large-scale potato farm in the Texas Panhandle and produce the majority of potatoes that are grown in Texas. ROA.459. Larsen's farming operation covers more than 50,000 productive acres and relies exclusively on groundwater for irrigation. *Id*.

Appellee is the North Plains Groundwater Conservation District (NPGCD or the District).  In Texas, groundwater production is regulated by a patchwork of 98 groundwater conservation districts or GCDs.[2] GCDs are created under the Texas Constitution, Article III, Section 52 or Article XVI, Section 59, and are empowered to regulate the spacing of water wells, the production from water wells, or both.[3] When developing their rules, groundwater conservation districts are required to use

---

[2] www.twdb.texas.gov/groundwater/conservation_districts/facts.asp
[3] *Id*.

the "best available science." Tex. Water Code § 36.0015(b)[4]. The District has rules governing well density and spacing, which rules take into consideration a well's gallon-per-minute capacity, the distance of wells from neighboring property lines, and the distance between wells.[5] The District has enacted production limitations of 1.5 acre-feet per acre and requires that production to occur within "groundwater production units" (GPUs). By rule, these GPUs must be no more than 1600 acres, and their most distant diagonal corners must not be more than 25,000 feet apart.[6] The boundaries of GPUs that are under common ownership  must be "coexistent with a Section boundary or sub-Section boundary with boundaries no smaller than a quarter of a quarter of Section, whichever is smaller, based on the midpoint protraction of the Section."[7] The District's rules limiting the size and shape of GPUs are referred collectively herein as the "GPU Rule." A landowner may revise their GPU declarations on a yearly basis.[8] Changing the boundaries of those GPUs has no impact on the locations of wells within those GPUs. ROA.3019.

By requiring landowners to declare groundwater production units, and by limiting the geometry of those GPUs, the District has mandated that landowners

---

[4] "Best available science" means "conclusions that are logically and reasonably derived using statistical or quantitative data, techniques, analyses, and studies that are publicly available to reviewing scientists and can be employed to address a specific scientific question." Tex Water Code § 36.0015(a).
[5] District Rules 3.1-3.10
[6] District Rule 7.5.
[7] District Rule 7.6
[8] District Rule 7.3

balkanize their property into a kaleidoscopic array of production units. Only one of the other 97 groundwater conservation districts in Texas requires landowners to declare GPUs, and NPGCD is the only groundwater conservation district that restricts the GPUs shape. While the District insists that spatial and geometric limitations on GPUs serve the purposes of "avoid[ing] excess depletion…and negatively affect[ing] neighbors…", it admits that the specific limitations were not implemented with reference to the best available science, and no hydrologist was consulted in the process. ROA.2511-ROA.2524. In short, the District's rules governing the shape and size of groundwater production units are the *only* rules of their kind in the State, and they are admittedly not based in hydrology or enacted with regard to the "best available science."

Larsen has declared several GPUs on its more than 50,000 acres. NPGCD alleges Larsen has over produced from four to six of these GPUs during various years since 2021. In 2022, Larsen sought a variance from the size and distance requirements of the GPUs pursuant to District Rule 11.2. ROA.828. The District denied that request for a variance by its Order No. 023-001. ROA.1905-ROA.1911. That order contains a rote recitation of the administrative history of Larsen's variance application, reproduces statutes and rules without analysis, and summarizes what was considered before the variance request was denied. The District's corporate representative would go on to testify that the District has never granted a variance

from its rules. Larsen filed the present case under the Equal Protection, Due Process, and Takings Clauses of the United States Constitution, and sought a declaratory judgment that the District's GPU Rules were *ultra vires*.

The District moved to dismiss Larsen's suit pursuant to Rule 12(b)(6). ROA.498. The district court correctly denied that Motion in relevant part on March 14, 2024. ROA.828. The parties conducted discovery over the next several months.

The district court granted summary judgment in the District's favor, finding that Larsen did not put forth evidence of a *per se* or regulatory taking, that Larsen's due process rights were not violated, and that Larsen could not put on any evidence that it was treated differently than any other similarly situated landowner. ROA.2952. The district court's Order also granted summary judgment to NPGCD on Larsen's *ultra vires* claim and invited Larsen to file a response. ROA.2973. Larsen filed its Response to that *sua sponte* Motion, and on December 13, 2024, the district court affirmed its earlier grant of summary judgment on the *ultra vires* claim. The District moved for partial summary judgment on its counterclaim to impose penalties for Larsen's alleged rule violations, and on May 23, 2025, the district court entered its Memorandum Opinion and Order dismissing NPGCD's counterclaims for want of jurisdiction. ROA.6948. That same day the district court entered final judgment. ROA.6955.

This appeal followed. ROA.6956

## VIII.  <u>SUMMARY OF THE ARGUMENT</u>

The district court's decision rests on two fundamental errors: an impermissibly broad reading of a groundwater conservation district's limited statutory authority and the improper weighing of disputed evidence at summary judgment.

NPGCD's GPU Rule finds no footing in either the District's enabling act or Chapter 36 of the Texas Water Code. Texas law is clear: groundwater districts may only exercise powers "clearly granted" by the Legislature. While districts may limit production based on tract size or well spacing, nothing in statute authorizes a district to dictate the size and shape of a tract from which groundwater may be produced. The GPU Rule's geometric and spatial limitations are not indispensable to the District's enumerated powers; they are merely administrative conveniences, and thus *ultra vires*.

Even if NPGCD had statutory authority to impose the geometric and spatial limitations of the GPU Rule, whether that rule is rationally related to the limited purposes for which a groundwater conservation district may regulate groundwater production is a question that turns on disputed fact questions. Competing expert testimony directly contradicts the District's hydrological justifications. Larsen's expert demonstrated that GPU boundaries have no impact on aquifer drawdown, a view reinforced by the District's own expert witness. The district court's decision to

credit one expert over another was an improper credibility determination at the summary judgment stage.

The GPU Rule effects an uncompensated taking of Larsen's groundwater rights. Like the unconstitutional proration orders in *Marrs v. Railroad Commission*, the Rule deprives Larsen of a fair chance to recover his correlative share of water and facilitates drainage to neighboring tracts. The record also demonstrates an outright destruction of more than 3,600 acres' worth of water rights and millions of dollars of damage to the fair market value of Larsen's farm. These facts are sufficient to raise a jury question under both *per se* and *Penn Central* regulatory takings frameworks. The district court's reliance on a bright-line percentage-loss threshold in evaluating *Penn Central's* economic impact factor, and its reliance on constructive notice to defeat the investment backed expectations factor is at odds with controlling precedent from both the Supreme Court of the United States and Texas Supreme Court. The district court's determination that the "character of the government action" factor weighed against a regulatory taking followed naturally from the district court's error in resolving Larsen's *ultra vires* claims.

Finally, the District's denial of Larsen's variance request violated procedural and substantive due process. The denial was arbitrary and capricious because NPGCD afforded Larsen no pre-hearing notice of the criteria that would govern his request, did not adequately explain its rationale for denying Larsen's application,

and, when challenged, the district court afforded only post-hoc rationalizations for its action. Substantively, the GPU Rule is not rationally related to the legitimate purposes for which the District may regulate, and its application causes material harm to Larsen's property interest in its groundwater.

The judgment below should be reversed, and the case remanded for trial so a jury may decide these disputed factual and constitutional issues.

## IX.   <u>ARGUMENT</u>

### A. Standard of Review

A grant of summary judgment is reviewed *de novo*, applying the same standard as the district court. *Tango Transp. v. Healthcare Fin. Servs. LLC*, 322 F.3d 888, 890 (5th Cir. 2003). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court views the evidence in a light most favorable to the non-movant. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d  528, 533 (5th Cir. 1997).

To defeat summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial to avoid summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A genuine issue of material fact exists when the evidence is such that a reasonable jury could

return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When determining if a genuine issue of material fact exists, a court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## B. The district court erred by granting summary judgment to NPGCD on Larsen's *ultra vires* claim.

Larsen's claims each proceed from either the imposition of certain district rules, or from the procedures employed by the District in denying a variance from those rules. Because the NPGCD rules are central to this appeal, the district court's error in granting summary judgment to NPGCD is best understood through a discussion of the District's statutory authority and how it exceeded that authority when implementing and enforcing its rules.

### a. The GPU Rule

This case originated from NPGCD's attempt to impose penalties on Larsen for excessive groundwater production within what it terms "Groundwater Production Units" ("GPUs"). NPGCD requires groundwater producers to designate GPUs within their contiguously owned acreage, and to report groundwater produced from those GPUs. The District Rules constrain the size and shape of a GPU as follows:

> 7.5 Limitations on a GPU's size and Shape: A GPU shall contain no more than 1,600 acres and the most distant

diagonal corners of the GPU shall not be more than 25,000 feet apart.

7.6 GPU Boundary: The boundary lines between two adjacent GPUs that are under the same common ownership shall be coexistent with a Section boundary or sub-Section boundary with boundaries no smaller than a quarter of a quarter of a Section, whichever is smaller, based on midpoint protraction of the Section. For purposes of this Rule, a quarter Section is considered the standard quarter Section and refers to the NE/4, SE/4, NW/4 and SW/4 of a Section.

NPGCD Dist. R. 7.5, 7.6; ROA.1443.

Rules 7.5 and 7.6 are referred to collectively herein as the "GPU Rule." Production volumes are limited by District Rule 6.1, which provides that the owner of groundwater rights may annually produce up to 1.5-acre feet of groundwater per acre in a GPU. As a result of the geometric and spatial limitations of GPUs, landowners with more than 1600 contiguous acres are obliged to balkanize their property into a dizzying array of bizarre shapes that, as discussed below, fail to serve any hydrological (and therefore regulatory) purpose. For example, the following illustration shows GPU 9251 with associated well locations:



ROA.3029.

The circles or "dots" within GPU 9251 represent wells. While the well locations remain static, the boundaries of any given GPU may change on a year-to-year basis. ROA.3019. Since groundwater is produced from wells, actual groundwater production occurs in the same location even if the GPU boundaries change. *Id.*

The District maintains that the purpose of the GPU Rule is to "limit the impacts of large-scale intensive water usage to protect the property interests of surrounding landowners." ROA.516. This purpose is sometimes stated as "spreading out" production, or "prevent[ing] excessive depletion of the aquifer in localized areas." ROA.2450; ROA.2516. In effect, the GPU Rule acts as a second

spacing rule over and above the District's well spacing rule, which is applicable to all landowners. ROA.1420; ROA.2516.

The summary judgment record reveals that the District lacked statutory authority to impose spatial and geometric constraints on GPUs, and that fact issues were raised as to whether the GPU Rule rationally relates to an authorized regulatory purpose.

> *b. NPGCD is not statutorily authorized to regulate groundwater production by dictating the geometric and spatial limitations of private property.*

Groundwater conservation districts may exercise "a very limited number of corporate functions." *Tri-City Fresh Water Supply Dist. No. 2 v. Mann*, 142 S.W.2d 945, 948 (Tex. 1940). "The powers of such districts are measured by the terms of the statutes which authorized their creation, and they can exercise *no authority* that has not been clearly granted by the legislature." *Id* [emphasis added]. Groundwater conservation districts lack the broad police powers of municipalities, their ability to regulate is more akin to "counties, townships and school districts" whose powers "are generally more strictly construed than those of municipalities." *Id*. Crucially, GCDs have only the powers "clearly granted by the Legislature." *South Plains Lamesa R.R., Ltd. v. High Plains Underground Water Conserv. Dist. No. 1.*, 52 S.W.3d 770, 779 (Tex.App.—Amarillo 2001, no pet.)("[W]e presume that applicable

Water Code provisions were enacted by the Legislature with complete knowledge of the rule that any authority granted to a district must be clearly granted).”

*South Plains Lamesa* is particularly instructive for understanding the limited scope of a GCD's rule making power. In that case, the High Plains Underground Water Conservation District No. 1. denied a permit application because it would have resulted in a disproportionate amount of production compared to tract size. *Id.* at 773. At that time, groundwater conservation districts had the authority to regulate “the spacing of water wells, the production from water wells, or both,” but the Water Code did not clearly grant the authority to regulate production *based on* tract size. *Id.* at 776-779. The *South Plains Lamesa* court explained that:

> Although section 36.101 authorizes the District to make rules to control subsidence or prevent waste of groundwater, and section 36.116 authorizes the District to provide for spacing of water wells and regulation of production of wells for the four purposes stated in that section, these sections do not clearly authorize the District to revoke or deny a well permit to prohibit the production of a disproportionate amount of groundwater as it relates to the tract size. Because the right to withdraw underground percolating water is not correlative, but is “absolute,” and the Legislature has not enacted a “reasonable use” rule as exists in other jurisdictions, and considering that by section 36.002, the Legislature provided that nothing in the Code shall deprive or divest the owners of groundwater or their ownership rights, we hold that the applicable code provisions do not *clearly* authorize the District to enact a regional rule to prohibit

the production of a disproportionate amount of groundwater as it relates to the size of the tract or to implement a reasonable use rule.

*Id.* at 779-80 (internal citations omitted) [emphasis original]

Here, the district court noted that there was no dispute that NPGCD is constrained to act only within its statutory authority. ROA.2968. The court's error results from misapprehending the scope of NPGCD's express powers. Developing this point requires a discussion of statutory construction.

NPGCD's enabling legislation is codified at Chapter 8887 of the Texas Special District Local Laws Code. In addition to its organic statute, the District's powers are derived from and limited to the provisions of Chapter 36 of the Texas Water Code. Tex. Spec. Dist. Loc. Laws Code § 8887.101. Chapter 8887 provides that the District may adopt rules relating to well spacing to prevent water table drawdown and reduction of artesian pressure within a groundwater reservoir or reservoir subdivision and regulate production *from wells*. Tex. Spec. Dist. Loc. Laws Code § 8887.104. When analyzing the statutory powers of a groundwater conservation district, courts give no deference to the district's own interpretation of its powers. *Guitar Holding Co., L.P. v. CL Mach. Co.*, 209 S.W.3d 146, 154 (Tex.App.—El Paso 2006), rev'd on other grounds, 263 S.W.3d 910 (Tex. 2008). Therefore, if NPGCD has a "clearly granted" power to require landowners to

designate GPUs and to dictate the size and shape of those GPUs, then that power must be found in Chapter 36 of the Texas Water Code.

Section 36.101 authorizes districts to adopt and enforce production limits "based on tract size or the spacing of wells." Tex Water Code § 36.101(a). There is no mention in this portion of the code to "groundwater production units" or the power to dictate maximum tract size or shape. Section 36.116(a) authorizes groundwater districts to regulate spacing and production for specific purposes, and section 36.116(a)(2) provides the methods by which production of groundwater may be regulated:

(A)    Setting production limits on wells;
(B)    Limiting the amount of water that may be produced based on acreage or tract size;
(C)    Limiting the amount of water that may be produced from a defined number of acres assigned to an authorized well site;
(D)    Limiting the maximum amount of water that may be produced on the basis of acre-feet per acre or gallons per minute per well site per acre;
(E)    Managed depletion; or
        Any combination of the methods listed above in Paragraphs (A)-(E).

Tex. Water Code § 36.116(a)(2)

Section 36.116(e) provides that, in regulating the production of groundwater under subsection (a)(2), a district: (1) *shall* select a method that is appropriate and based on the hydrogeological conditions of the aquifer or aquifers in the district; and (2)

may limit the amount of water produced based on *contiguous surface acreage*. Tex. Water Code § 36.116(e)[emphasis added].

Here's the difference: a groundwater district is authorized to pass a rule saying that a landowner may produce a certain amount of water annually per owned acre. For example, the District's rules state a landowner may produce 1.5 acre feet per acre per year. The total "allocation" is then *based on* the tract size times the production rate. But what the District has attempted to do is to limit the size a tract may be, then impose the production limit on that arbitrary size.

In finding that the GPU Rule is authorized, the district court observed that Section 36.116(a)(2)(B) "must afford the District authority to define tract size" and that without that authority, the District would be "strip[ped] of all parameters by which it could regulate groundwater production." ROA.2972-ROA.2973. The district court's observation is disproved by reference to the other 96 groundwater conservation districts that regulate groundwater production, without drawing into themselves the power to determine the maximum size of a "tract."[9] It is also noteworthy that the court in *South Plains Lamesa* did not mention the power to dictate the maximum size of a tract as a critical element of a district's ability to

_____

[9] Mesquite Groundwater Conservation District requires designations of GPUs, but does not place a geometric limitation on those GPUs. While the Mesquite GCD does limit GPUs to 640 acres, the absence of a constraint on the shape of the GPU avoids much of the trouble presented by NPGCD's rules. Mesquite GCD Dist. R. 5.4.

prevent disproportionate production <u>based on</u> tract size.  Even if the power to define tract size was an administrative necessity, the district court's opinion never addresses the fact that NPGCD also dictates the permissible *shape* of a GPU.  Assuming arguendo that the district court correctly found that the authority to regulate based on "acreage or tract size" includes the right to determine the maximum acreage of a subset of property "for administrative purposes," the court never attempted to address whether that power included the ability to set a 25,000-foot maximum between the subset's most distant corners.

"Size" and "shape" are not synonyms. There is simply no logical connection between a GCD's statutory authorization to limit production based on "acreage or tract size," and NPGCD's arrogation of the power to constrain the shape of a subset of land from which a landowner may produce groundwater.  Since neither NPGCD's enabling act nor the Water Code expressly allows the District to regulate the maximum size or shape of a tract in enacting production limitations, those powers can only exist if they are *indispensable* to the exercise of the District's expressly enumerated powers. *See Builder Recovery Servs., LLC v. Town of Westlake*, 650 S.W.3d 499, 503 (Tex. 2022)(implied powers are limited to those that are indispensable to the entity's ability to carry out its statutory functions). The reasonable necessity of an implied power will not be lightly assumed, and "will be

implied only when without its exercise the expressed duty or authority would be rendered nugatory." *Id.* (quoting *Foster v. Waco*, 225 S.W. 1104, 1106 (Tex. 1923).

Like the GCD involved in *South Plains Lamesa*, NPGCD undeniably has the authority to regulate groundwater production generally. But the Water Code limits the specific way that power may be exercised. Tex. Water Code § 36.116(a)(2). While production limitations *based on* acreage or tract size are permissible, the power to dictate the geometric and spatial limitations of a tract is a mere administrative convenience. It is not indispensable to the exercise of the District's expressly enumerated powers.

NPGCD lacks statutory authority to enact the GPU Rule, and the district court committed error by finding otherwise. That error was compounded when the district court weighed the competing summary judgment evidence to conclude, as a matter of law, that the GPU Rule met the Water Code's statutory purposes. ROA.2968.

> c. *The district court improperly weighed expert testimony to determine that the GPU Rule fulfils the District's statutory purposes.*

A groundwater district may regulate groundwater production for a limited number of purposes. Those are: "to minimize as far as practicable the drawdown of the water table or reduction of artesian pressure, to control subsidence, to prevent interference between wells, to prevent degradation of water quality, or to prevent waste." Tex. Water Code § 36.116(a). The district court improperly found that "the

District has proffered uncontested summary judgment evidence that its rules minimize drawdown of the water table." ROA. 2969. According to the district court, that evidence was deposition testimony of Wade Oliver to the effect that, within a specific GPU owned by Larsen, "additional production above 1.5 acre-feet per acre would result in up to 30 feet of additional drawdown within that GPU over the desired future condition timeline from 2018 through 2080, with all other conditions static." ROA.2969. Summary judgment cannot rest on this testimony because it was contested, and because Mr. Oliver rejected the very observation the court relied on.

i. *Mr. Oliver's testimony was directly opposed by Larsen's expert, Michael Thornhill*

Mr. Thornhill testified that "[h]ydrological science demonstrates that the GPU Rule does not accomplish any of the statutory purposes of a groundwater district." ROA.3015-ROA.3017. Mr. Thornhill's explanation of this conclusion involves a detailed analysis of how drawdown occurs in the Ogallala aquifer. ROA. 3016-ROA.3022. Thornhill describes how the measurable drawdown due to well pumping in an aquifer like the Ogallala is relatively limited regardless of pumping rate and that at the end of the pumping season, water levels in the aquifer recover to static or "non-pumping conditions." ROA.3017-ROA.3018. He goes on to explain that when the water levels recover at the end of the pumping period, the overall drawdown equalizes regionally. ROA.3018.

The specific configurations of the GPUs do not impact drawdown because (1) they can be changed yearly, (2) the wells from which water is pumped do not move based on the GPU configuration, and (3) the aquifer is agnostic to GPU configuration because "[j]ust as property boundaries or county boundaries do not constitute hydraulic boundaries—neither do GPUs." ROA.3017-ROA.3022. According to Thornhill, overall aquifer drainage is the primary driver of Desired Future Conditions (DFCs)[10], and aquifer drawdown is caused by cumulative pumping and not influenced at the local level of GPUs. CR3024. The functional disconnect between the GPU Rule and hydrological reality is further evidenced by NPGCD's corporate representative's testimony to the effect that the 25,000-foot limitation on a GPU's most diagonal corners was once a 15,000-foot limitation but was increased "to allow flexibility in designating GPUs" rather than for hydrological reasons. ROA.3019.

Thornhill's testimony regarding the ineffective nature of the GPU Rule was not merely injected into this case to defeat summary judgment. His opinions have remained unchanged since at least 2022. In fact, NPGCD's appendix in support of its Motion for Partial Summary Judgment includes the entirety of Mr. Thornhill's testimony on this subject from the 2022 hearing on Larsen's request for a variance

---

[10] DFCs are a groundwater district's opinion of the desired condition of a given aquifer at the end of a designated time period, considered across the whole aquifer. Water Code Sec. 36.108(d).

from the GPU Rule.  ROA.2399-ROA.2418. At that hearing Mr. Thornhill was asked "does [the 1600-acre limitation] minimize drawdown on the water table" to which responded "Not--no, not at all." ROA.2407. Thornhill provided the same answer to a question regarding the 25,000-foot diagonal rule. ROA.2408. The spatial and geometric limitations are arbitrary because, from the aquifer's perspective, there is no difference between producing 1.5-acre feet per acre on 3200 acres versus producing that same amount on two separate 1600-acre tracts. ROA.2412.

In short, Mr. Oliver's testimony was far from uncontested. The district court at the summary judgment stage effectively took reliable testimony from two separate experts, decided to give more weight to one of those experts, and to disregard the existence of the competing testimony. The district court abused its discretion by weighing evidence at the summary judgment stage, and that error resulted in an improper judgment. *Seigler v. Wal-Mart Stores Tex.*, 30 F.4th 472, 476-77 (5th Cir. 2022)(on summary judgment all facts and reasonable inferences are construed in favor of the nonmovant, and the court should not weigh evidence or make credibility findings).

    *ii.*   Mr. Oliver's testimony regarding the additional 30 feet of drawdown was not part of his expert opinion.

The district court found that the GPU Rule met the statutory purposes of the Water Code because Wade Oliver produced models showing that "additional

production above the 1.5 acre-feet per acre would result in up to 30 feet of additional

drawdown" over the 80-year time horizon of NPGCD's desired future conditions.

ROA.2969.   This grossly mischaracterizes Oliver's testimony. The "models" the

court referred to in its opinion were rejected by Oliver, and not incorporated into his

report.  Specifically, Oliver testified that he conducted modeling, but did not rely on

it, incorporate it into his report, or adopt it as his opinion:

> Q: All right. Did you do any modeling with respect to the
> aquifer, either generally under the District or specifically
> under BLF Land?
>
> A: So that was one of the things that we looked at or
> evaluated early on, which was to try and quantify the
> impact of additional production above that 1.5 acre-feet
> per acre.
> I did the modeling and produced some draft results out of
> that, and those results weren't reviewed. **As I looked at it,
> it didn't seem like it was making an important point,
> so I didn't move forward with it and include it in my
> findings there**.
>
> Q. What exactly did the modeling show you?
>
> A: Again, **relying on memory here**, that the additional
> production above 1.5 acre-feet per acre would result in up
> to 30 feet of additional drawdown, sort of focused on those
> areas where there was additional production, and then it
> would diminish from there.
> …

Q: So to be clear, you did modeling with respect to GPUs that had produced more than 1.5 acre-feet per acre per year?

A: Yes, but I want to emphasize that this was draft modeling early in the process, **not something that we really leaned on to form these opinions or the opinions that I stated in my report**.

ROA.2699-ROA.2700 [emphasis added]

Consistent with this testimony, Mr. Oliver's report contains no mention of the impact of Larsen pumping more than 1.5 acre-feet per acre from any GPU. Contrary to the district court's opinion on the parties' motions for summary judgment, Mr. Oliver did not rely on any modeling in reaching any of his opinions. In fact, he expressly *excluded* the modeling from his report, and he did so because "it didn't seem like it was making an important point." ROA.2699. Oliver's testimony regarding the result of the modeling he conducted is related from memory and cannot be said to conclusively establish that 30 feet of additional drawdown would occur over the 80-year DFC period. ROA.2699-ROA.2700. Critically, Mr. Oliver expressly disavowed relying on the modeling. *Id*. Even though the court attempted to rely on it, the modeling itself is absent from the record. Far from being "uncontested," the modeling data was disavowed by its supposed proponent. Because Mr. Oliver disavowed his own modeling, it has no evidentiary value. At most, a fact issue was raised concerning the weight to be given that modeling. Having found Thornhill's

testimony admissible, the district court erred when it gave Oliver's testimony the weight of conclusive proof and seemingly ignored Thornhill's conflicting testimony. ROA.2969.

In summary, the district court's ultra vires ruling suffers two flaws: there is no statutory basis for the GPU Rule, and if there were, there was contested summary judgment evidence about whether the GPU Rule meets any purpose for which the District may regulate groundwater production.

## C. The district court erred by granting summary judgment to the District on Larsen's takings claim.

The district court erred by finding that there had been no taking of plaintiff's property as a matter of law on both of Larsen's taking theories. ROA.466-ROA.468. Larsen advanced a *per se* taking theory based on the principles found in *Marrs v. RRC*, 177 S.W.2d 941, 948 (Tex. 1944) and a traditional regulatory taking theory based on the principles set forth in *Penn Central*. ROA.466-ROA.468. The district court found both theories failed as a matter of law. ROA2963; ROA.2967. At a minimum, the summary judgment evidence conflicts as to the viability of these theories, and the district court erred in weighing that conflicting evidence in favor of the summary judgment movant. *Wal-Mart Stores Tex.*, 30 F.4th 472, 476-77 (5th Cir. 2022)

a. *Per se taking*

Under Texas law, a landowner's property rights include the ownership of groundwater in place beneath his acreage, and such ownership is subject to takings claims. *Stratta v. Roe*, 961 F.3d 340, 359 (5th Cir 2020) *citing Edward's Aquifer Auth. v. Day*, 369 S.W.3d 814, 817 (Tex. 2012). As with oil and gas, one purpose of groundwater regulation is to afford each owner of water in a common, subsurface reservoir a fair share "of the ground water beneath their property." *Day*, 369 S.W.3d at 830.  The district court seized upon the fact that affording groundwater owners their fair share "must take into account factors other than surface area." *Stratta v. Roe*, 961 F.3d at 360.  Nevertheless, as the *Stratta* court observed regarding the takings claim at issue in that case "it seems highly pertinent, notwithstanding the statutory list of factors," that the district "opted for Rules based on spacing and production limits." *Id*. The *Stratta* court found that the district's rules based on spacing and production limits were relevant to a takings claim because production limitations are tied proportionately to contiguously owned acreage. *Id*. Under Texas law, the denial of a fair chance to recover a fair share of as subsurface estate constitutes confiscation. *Day,* 369 S.W.3d at 843. Here, NPGCD also has a system that nominally focuses on correlative rights, that is it makes production a function of contiguous surface acreage.

Larsen's hydrology expert provided testimony explaining how the GPU Rules cause landowners to lose their fair chance to recover water under their land.

25

ROA.2569. Michael Thornhill explains that if two landowners own the same size and shaped tract of land, they should have the same "fair chance" to produce the same amount of water. If those landowners are allocated a certain amount of production per contiguous acreage, then they are afforded a fair opportunity to produce a fair share of their groundwater. If the landowners are required to arbitrarily subdivide their property into GPUs of finite dimensions, then hydrological properties of the aquifer will alter the ability of the landowner with less advantageous tract geometry to produce the same per-acre allocation. ROA.1525; ROA.2569. In essence, this was the problem the Supreme Court had before it in *Marrs*.

In *Marrs*, the Texas Supreme Court had before it a similar situation to the one presented by this case. There, certain mineral rights owners challenged a ruling by the Texas Railroad Commission concerning production allowances in a field long shown to be productive of oil. *Marrs*, 177 S.W.2d at 943. In summary, a group of mineral owners in the northern portion of the field established early production from numerous wells, thereby creating a "pressure sink" that would cause oil to migrate (or "drain") toward that area. *Id*. Owners in the southern portion of the field developed their wells at a slower pace, but were able to demonstrate that substantial reserves of oil existed in their area, particularly as compared to the northern portion of the field. Meanwhile, the northern portion of the field had been substantially depleted. *Id*. Before the challenged RRC ruling, the owners in the southern portion

of the field established a line of "shield" wells that produced at maximum capacity and prevented drainage into the northern area. *Id* at 949. The Railroad Commission then established the challenged field rules which prevented the "shield" wells from operating at maximum capacity. The effect of this was to allow drainage from the southern field into the northern field. *Id* at 945. The *Marrs* plaintiffs sued on the theory that the production in the south area was so restricted by the Commission's proration orders that they could no longer recover their fair share of oil before it drained way into the more densely drilled northern field. *Id* at 946. The questions presented to the Court were whether the Railroad Commissions proration orders were arbitrary, unjust, and discriminatory, and deprived plaintiffs of their just property rights. *Id*. at 946-947. In answering in the affirmative, the Texas Supreme Court stated:

> Under the settled law of this State oil and gas form a part and parcel of the land wherein they tarry and belong to the owner of such land or his assigns and such owner has the right to mine such minerals subject to the conservation laws of this State. Every owner or lessee is entitled to a fair chance to recover the oil or gas in or under his land, or their equivalent in kind, and any denial of such fair chance amounts to confiscation.

*Id*. at 948

The Texas Supreme Court noted that, if left to their own remedy, the *Marrs* plaintiffs could prevent migration by creating their own low-pressure area—that is, producing from the "shield" wells. 177 S.W.2d at 949. The Court concluded that due

to the Railroad Commission's regulatory action, the plaintiffs were unable to prevent drainage from their southern field into the northern field, and that the proration order caused "…the taking of one man's property and the giving it to another" in violation of the Texas and U.S. Constitutions. *Id*.

The same situation presents itself here as set forth in the Affidavit of Michael Thornhill. ROA.2569. The district court disagreed and found that the problem before the court in *Marrs* is not posed here because there is no evidence of the kind of "pressure sink disparity" described in that case. ROA.2963. To support this conclusion, the district court cited to Thornhill's affidavit which stated that "neighbors whose GPU shapes are different can operate their wells at a greater rate for a longer time...[i]f BLF shuts its productive wells down to comply with the GPU Rules, the result is drainage." ROA.2963. The district court concluded its analysis saying "[h]ere we know nothing about the relative disparity between Plaintiffs' land and their neighbors." ROA.2963. This supposed "failure to connect the dots" supplied the district court's justification for finding that Larsen's property had not been taken as a matter of law.

Contrary to the district court's conclusions, Thornhill did specifically address the "pressure sink disparity" by explaining that the cone of depression impact from each well extends past the lines of designated GPUs. ROA.2569; ROA.3014-ROA.3027. This is the effect he references when he states that "[t]he GPU Rules

prevent BLF from using the full productive capacity of the wells in those GPUs. But neighbors whose GPU shapes are different can operate their wells for a longer period of time, resulting in drainage." ROA.2569. This is true because the cone of depression caused by pumping a well will extend beyond the GPU boundaries and into the GPUs of other landowners. The "pressure sink" disparity that the district court found missing is the basis for Mr. Thornhill's opinion regarding drainage. Moreover, "pressure sink disparity" is the basis for the District's *ad hoc* rationalization for the GPU Rule, as noted in Larsen's Reply to NPGCD's Response to Larsen's Motion for Summary Judgment. ROA.2688. In short, if a "pressure sink" disparity occurs, then denying Larsen a right to offset that pressure sink implicates a *Marrs* taking. If no such disparity occurs, then NPGCD's rules serve no purpose because groundwater pumping has no effect on neighboring properties. The district court's determination that there was no evidence that drainage will occur ignores the hydrological reality that if a landowner is pumping groundwater, and his neighbor is not pumping groundwater, then the neighbor is losing their groundwater to drainage. *See* ROA.2569; ROA.3014-ROA.3027.

Thornhill's supplemental affidavit delves further into the pressure sink disparity, and details how overall aquifer drawdown is not impacted by limiting production to 1600 acre GPUs. ROA.3014-ROA.3027. The district court erred in finding that Thornhill's testimony did not amount to *any* evidence of a taking. That

the district court would have "connected the dots" differently, does not mean that the dots were not connected. Importantly, the district court did not strike Thornhill's affidavit. Having exercised its discretion to allow the Thornhill affidavit into evidence, the district court erred by weighing and disregarding Thornhill's testimony at the summary judgment stage. Accordingly, some evidence existed to support Larsen's *per se* taking theory, and it was error for the court to grant summary judgment on that claim.

In response to the District's Motion for Summary Judgment, Larsen also put forth evidence from NPGCD's economics expert to show the destruction of more than 3,600 acres of its water rights by the mere existence of the GPU Rule. ROA.2462-ROA.2463. The District's expert agreed that, without the GPU Rule, Larsen's farm has the capacity to produce 1.69 gallons per minute on all of its irrigated acreage during the 130 day growing season. ROA.2497-ROA.2502; ROA.2569. With the GPU Rule, Larsen can only produce 1.53 gallons per minute per irrigated acre during the 130 day growing season. ROA.2497-ROA.2502; ROA.2569. If Larsen complies with the GPU Rule and does not overproduce in the four GPUs it is alleged to have overproduced from, then it must reduce production from those four GPUs by 6,450 gallons per minute over the growing season. Expressed in acre feet, that is a reduction from 9,674.51 acre feet to 5,969.02 acre feet for a total reduction of 3,705.49 acre feet. If a GPU were declared over a 640

acre section, then under the District's rules that section could produce 960 acre-feet. So the 3,705.49-acre foot reduction is equal to 5.75 sections of land that could be watered at 1.5 acre-feet if Larsen did not need to reduce production to comply with the GPU Rule. In effect, as applied to Larsen's farm, the GPU Rule eliminates 5.75 sections, or 3,680 acres, of Larsen's correlative rights in groundwater—a clear taking.

The district court disagreed with the foregoing analysis because the GPU Rule "does not prohibit [Larsen] from extracting the water they seek because [Larsen] can extract their desired water from other GPUs." ROA.2961. The court's reasoning neglects several practical and hydrological realities, including the fact that groundwater pumping is only useful to the landowner during the growing season and hydrogeological differences across a property can render certain wells incapable of producing at the *rate* required to meet the needs of the growing season.

Evidence of the destruction of substantial correlative rights was also in the record in the form of the testimony of Sabrina Leven. ROA.2396-ROA.2398. Ms. Leven's testimony establishes that Larsen was penalized for producing far fewer acre-feet per acre than the proportion of his total net water rights acreage would allow but-for the GPU Rule. *Id*.

Larsen put on evidence of a *per se* taking of the right to prevent drainage under *Marrs*, as well as evidence to demonstrate the destruction of more than 3,600

acres of correlative rights by mere application of the GPU Rule. ROA.2497-ROA.2502; ROA.2569 ROA.2396-ROA.2398. To arrive at its conclusion that Larsen failed to put on evidence of a per se taking, the district court needed to either weigh competing evidence or overlook the evidence Larsen presented. In either event, the district court erred in granting summary judgment against Larsen on its *per se* taking theory.

### b. Regulatory Taking

The district court erred in finding that Larsen presented no evidence to support a *Penn Central* regulatory taking. *See Penn Central Transp. Co. v. New York* City, 438 U.S. 104 (1978)(establishing the factors considered to find a regulatory taking). A *Penn Central* taking requires the weighing of three main factors and the totality of surrounding circumstances of a particular case. It is inherently a fact-intensive *ad hoc* inquiry. Specifically, under *Penn Central*, courts are to consider a variety of non-exclusive factors including: (1) the economic impact of the regulation on the claimant; (2) whether the regulation interferes with distinct investment backed expectations; and (3) the character of the governmental action. *Id* at 124. The United States Supreme Court has noted, and several lower courts routinely observe, that the *Penn Central* test "does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination of whether just compensation is required." *Palazzolo v. Rhode Island*, 533 U.S. 606, 620

(2001)(O'Connor, J. , concurring). No single *Penn Central* factor is determinative; all three must be evaluated together, as well as any other relevant considerations. *Day*, 369 S.W.3d at 840.

On the economic impact factor, the summary judgment record showed that Larsen's property lost value in the amount of at least two percent and as much as nine percent. ROA.2966. The district court found this reduction "not significant enough to suggest a regulatory taking under *Penn Central*." ROA.2966. Notably, the experts for both parties found that property without the regulation would be worth roughly $4,000,000 more than it would be with the regulation. ROA.2965-ROA.2966. The district court found the uncontested evidence of at least $4,000,000 in property devaluation was, as a matter of law, insufficient to suggest a regulatory taking. In arriving at this conclusion, the court listed several cases from different circuit courts to support its premise that "[n]o authority…has ever found economic impact that warrants a taking where the property's value fell less than 42.5%." ROA. 2965.

The district court's attempt to employ a mathematical brightline by which to evaluate the "economic impact" factor is misguided. As Justice O'Conner cautioned in *Palazzolo*, "*Penn Central* does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required," and courts must avoid the temptation to

"adopt what amount to per se rules in either direction." *Palazzolo*, 533 U.S. at 634 (O'Connor, J., concurring).

Texas courts are much more flexible in applying *Penn Central*'s economic impact factor to groundwater regulation. In *Edwards Aquifer Auth. v. Bragg*, the San Antonio Court of Appeals found that increased irrigation costs of less than ten percent weighed "heavily in favor of finding a compensable taking." 421 S.W.3d 118, 141 (Tex.App.—San Antonio 2013, pet. denied). It is notable that the *Bragg* court did not weigh the economic impact by determining the percentage decrease in fair market value, but instead looked at the economic impact as a function of increasing irrigation costs. *Id.*

Similarly in *Day*, the Texas Supreme Court found that "[b]y making it much more expensive, if not impossible, to raise crops and graze cattle, the denial of Day's application certainly appears to have had a significant, negative economic impact on him, though it may be doubted whether it has denied him *all* economically beneficial use of the property." *Day*, 369 S.W.3d at 840. The Court found that this evidence made the first factor "inconclusive" on its way to find that "the three *Penn Central* factors do not support summary judgment for the Authority and the State" *Id* at 840-43. The district court erred in adopting a *per se* percentage threshold by which to evaluate Larsen's takings claim, and by relying on that threshold to determine that no regulatory taking occurred as a matter of law. The district court also erred in

failing to consider the economic impact of eliminating more than 3,000 acres of correlative rights as discussed above in Section C. (a).

The second *Penn Central* factor looks to "the extent to which the regulation has interfered with distinct investment backed expectations." *Penn* Central, 438 U.S. at 124. On this factor, the district court found that "plaintiffs raise no dispute of material fact that the District's rules interfered with their investment backed expectations." ROA.2967. This finding is premised on the notion that "the NPGCD Rules on Withdrawals and Pooling were substantially identical to the version currently in effect when BLF purchased its property in 2011 and 2012." ROA.2966.

The district court's analysis is too narrowly focused on the regulatory environment that existed when Larsen purchased the property. Indeed, the Supreme Court has expressly rejected notice of the regulatory environment as a determinative factor in a takings analysis. *Palazzolo v. Rhode Island*. 533 U.S. 606, 627-30 (2001).

In that case a closely held corporation established by Anthony Palazzolo purchased eighteen acres of wetlands and a few additional acres of uplands in the 1960s. *Id* at 606. Palazzolo was unsuccessful in getting permission from the State to fill the wetlands and develop the property, and eventually the state adopted even more restrictive wetland regulations. *Id* at 614. Palazzolo's corporation dissolved in 1978, and he became the sole owner of the property. *Id*. He attempted to submit additional development applications, but these applications were denied. *Id* at 614-

615. Palazzolo sued claiming the state had engaged in a regulatory taking. *Id*. The Supreme Court of Rhode Island rejected the claim because Palazzolo acquired the property in 1978 after enactment of the various regulatory barriers to wetland development that plagued his most recent attempts to develop the property. *Palazzolo*, 746 A.2d 707, 717 (R.I. 2000).

Like the district court below, the Supreme Court of Rhode Island found that Palazzolo's notice of the regulatory regime rendered Palazzolo's investment-backed expectations unreasonable and defeated his claim that a per se taking had occurred. *Id* at 715-17. At the United States Supreme Court, the *Palazzolo* majority strongly criticized the constructive notice rule because it would allow the state to define property interests subject to constitutional protection by regulation observing that: "[t]he State's rule would work a critical alteration to the nature of property, as the newly regulated landowner is stripped of the ability to transfer the interest which was possessed prior to the regulation." *Id* at 627-28. Such a rule would create a slippery slope where the guarantees of the Takings Clause could be eroded simply by passing laws. In her concurrence, Justice O'Conner explained:

> Were we to accept the State's [notice] rule, the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. A state would be allowed, in effect, to put an expiration date on the Takings Clause. This ought not to be the rule. Future generations,

> too, have a right to challenge unreasonable limitations on
> the use and value of land.

*Palazzolo*, at 630 (O'Connor, J., concurring).

Justice Scalia's concurrence in *Palazzolo* goes as far as to claim that constructive notice of a regulation should not be considered in the investment backed expectations inquiry at all. *Id* at 636-37 ("…the fact that a restriction existed at the time the purchaser took title…should have no bearing upon the determination of whether the restriction is so substantial as to constitute a taking.")

Texas courts are also hesitant to apply a takings-terminating constructive notice rule. In looking at the investment backed expectation factor in *Day*, the Texas Supreme Court observed that:

> Presumably, Day knew when he bought the property that the Act had passed the year before and could have determined from the same investigation he made later that he could not prove much historical use of groundwater to obtain a permit. Had all this information demonstrated that his investment in the property was not justified, one could argue that he had no reasonable expectation with which the [EAA] could interfere. But the government cannot immunize itself from its constitutional duty to provide adequate compensation for property taken through a regulatory scheme merely by discouraging investment. While Day should certainly have understood that the Edwards Aquifer could not supply landowners' unlimited demands for water, we cannot say that he should necessarily have expected that his access to groundwater would be so severely restricted.

*Day*, 369 at 840.

Here, NPGCD and the district court leaned heavily on the fact that the GPU's predecessor rule existed when Larsen purchased the property. ROA.2966-2967. In effect, the District is attempting to claim that knowledge of existing regulations should be sufficient to cut off any takings claim based on similar regulations that may be passed in the future. While Larsen may have constructive knowledge of regulations existing when it purchased the farm, the effect of that constructive knowledge cannot, per *Palazzolo* and *Day*, be the complete defeat of Larsen's takings claims. State law defines the contours of property ownership in Texas, and to that end the Texas Supreme Court has found that knowledge of pre-existing limitations on groundwater production does not defeat a *Penn Central* taking. The case should be reversed for the "essentially *ad hoc*" *Penn Central* analysis to be fully developed on a complete factual record.

The final *Penn Central* inquiry looks to the "character of the government action." Here, the district court concluded this factor against finding a taking by citing the statutory purposes for which groundwater production may be regulated, then stating that "[t]hese public-oriented justifications for regulating groundwater production sufficiently justify the District's rules as applied to Plaintiffs." ROA.2967. Essentially, the district court weighed this factor against Larsen because

it had previously found that the GPU Rule meets a groundwater district's statutory purposes for regulating production. As discussed *supra* that finding was erroneous, and the district court had to ignore conflicting summary judgment evidence to reach it in the first instance. This court should reverse the district court's summary judgment on Larsen's takings claim, and remand the case for a full trial.

**D. The district court erred in finding that the District did not violate Larsen's due process rights.**

NPGCD argued, and the district court accepted, that Larsen's due process rights were not violated because Larsen was afforded a hearing on its variance request, and because the GPU Rules have a rational basis. ROA.2974. Neither NPGCD's analysis of Larsen's due process claims nor the district court's opinion met, much less disposed of, the totality of due process theories advanced by Larsen. For instance, the district court's order granting summary judgment makes no mention of Larsen's complaint that NPGCD sought to disproportionately penalize BLF for over production without reference to a rubric for how those proposed penalties were calculated and whether they are disproportionate to the alleged harm they sought to remedy. ROA. 472.  The district court's final judgment should be reversed and the cause remanded to, at a minimum, address the due process theories that the district court overlooked in rendering summary judgment. Fed. R. Civ. P. 54(b). Moreover, the case should be remanded for further proceedings because the

district court erroneously granted summary judgment on the due process claims it did address.

*a.    Procedural Due Process*

While the district court focuses exclusively on the process (a hearing) that Larsen was afforded, it never addressed the fact that BLF's application for exception to the GPU Rules was denied without explanation. The district court initially acknowledged this fact in denying NPGCD's Motion to Dismiss:

> Plaintiffs argue [their due process claims should survive the pleading stage] because the Order did not state any basis for denying Larsen's application. Pages 1 through 3 recite the administrative history of Plaintiff's variance application but do not address the evidence presented at the hearing. Pages 3 through 7 reproduce statutes and rules without further analysis, and page 7 summarizes what NPGCD's board considered before denying the application.

ROA.833 (internal citations omitted)

NPGCD's Order denying the variance does not establish a rationale for the District's action, and no specific rationale was ever offered during discovery. The District's corporate representative was asked why the variance application was denied, and testified that "…I believe, for the whole Board, the reason the exception or the – excuse me—the reason for denying the Plaintiffs' request for an exception to the rule was that the presentations made by you, by your witnesses, and by the testimony of

you and your witnesses, nothing of merit rise to occasion to warrant the exception to the rule." ROA.2534-ROA.2535.

Larsen argued in Response to NPGCD's Motion for Summary Judgment, that to the extent the corporate representative's testimony "provides more of a rationale for the District's denial of the variance request than the District's previous Order, it is a *post hoc* rationalization." ROA.2470. If NPGCD must engage in *post hoc* rationalizations to justify its denial of the variance request, then there is some evidence that the District's decision was arbitrary and capricious.

The district court disagreed, noting that the case law relied on by Larsen regarding *post hoc* rationalizations dealt with federal Administrative Procedure Act, and therefore was "inapposite." ROA.2976. While the district court was correct that analysis of judicial review under the APA is different than a due process analysis, it was not correct in concluding that *post hoc* rationalizations are irrelevant to due process questions. The essential principles of due process include notice and an opportunity for hearing appropriate to the nature of the case. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 5322, 542 (1985). To be meaningful, "notice" and "hearing" require *previous notice* and a hearing *relative* to the issues of fact and law which will *control the result to be reached* by the administrative tribunal. *Madden v. Tex. Bd. of Chiropractic Examiners*, 663 S.W.2d 622, 626 (Tex.App.—Austin 1983, writ ref'd n.r.e.)(citing *Morgan v. United States*, 304 U.S. 1, 18-19 (1938)).

The fact that the federal APA does not govern this case does not change the fact that *post hoc* rationalization by government agencies is indicative of arbitrary and capricious action. Due process requires that a person be made aware of what ultimate issues will control the government's decision. *Madden*, 663 S.W.2d at 626. This is not an esoteric doctrine applicable only to the arcane procedures of federal agencies. Fundamental fairness is threatened where the government justifies its actions on a *post hoc* basis. Those appearing before the government must be afforded *prior notice* of the issues of fact and law which will control the result to be reached, and violating this principle "contravenes fundamental fairness and renders the agency decision arbitrary and unreasonable." *South Plains Lamesa*, 52 S.W.3d at 782 (Quinn, J. concurring).

The district court concluded that Larsen's due process claim failed because NPGCD held a hearing. That analysis is far too shallow. To date, NPGCD has never enumerated what facts are relevant to a variance request and did not provide an articulable basis for granting or denying variance requests. As the district court observed in denying NPGCD's motion to dismiss on this claim, "[h]ere neither the Order nor NPGCD's briefing explains the rational relationship between the denial and NPGCD's legitimate interests stated *supra*." ROA.834. At a minimum, Larsen was entitled to know, before the hearing on the variance application, what factors the District considered in apparently granting exceptions to Rule 7.5's spatial and

geometric limitations as discussed above in Section II, *supra*. The District's pre-hearing and post-hearing failure to articulate a standard by which its decision was governed rendered the variance procedurally deficient to protect Larsen from an erroneous decision, or worse a decision couched in the District's animus.

That the District engaged in *post hoc* rationalizations to justify its Order denying Larsen's variance request coupled with the absence of any advance warning of what issues would control the hearing on the variance request, is at least some evidence of fundamental unfairness underlying the District's treatment of Larsen, and is relevant evidence to support Larsen's due process claim. Accordingly, the district court erred by granting summary judgment on Larsen's due process causes of action.

### b.     *Substantive due process*

The district court's error in jettisoning Larsen's procedural due process claim was largely repeated in the subsequent conclusion that Larsen had no evidence to support his substantive due process claim. ROA.2976.  In finding that Larsen's substantive due process claim failed as a matter of law, the district court merely stated that "[NPGCD]'s decision was never arbitrary and capricious…its order denying Plaintiffs' variance request incorporated all prior procedures spanning from July 20, 2021, through the December 13, 2022 hearing." ROA. 2976. This analysis resulted in error that must be corrected by remand to the trial court. The trial court

erred because there was some evidence to show that the GPU Rule did not advance a legitimate state interest, and because the district made no attempt to address Larsen's contention that the District's proposed over pumping penalties were grossly excessive in relation to the harm caused. Fed. R. Civ. P. 54(b); ROA.471-ROA.473.

First, where a regulation fails to advance a legitimate state interest, that regulation might be so arbitrary or irrational as to violate due process. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S 528, 549 (2005)(Kennedy, J concurring). Typically, these types of substantive due process challenges involve municipal land-use decisions and are evaluated under the rational basis test. *Simi Inv. CO. v. Harris Cty.*, 236 F.3d 240, 249 (5th Cir. 2000). The rational basis test typically presents a substantial hurdle to a claimant because the test asks, "only whether a rational relationship exists between [the governmental action] and a conceivable legitimate objective." *Id* at 251. Governmental action will only be found unconstitutional under the rational basis test if it is "clearly arbitrary and unreasonable having no relation to the public health, safety, morals, or general welfare." *FM Props. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996)(quoting *Village of Euclid v. Amber Realty Co.*, 272 U.S. 365, 395 (1926)). But this case does not involve the broad authority of municipalities.

Texas groundwater conservation districts have only limited powers and can only regulate for a narrow range of purposes. As discussed above in Section II *supra*,

a groundwater conservation district may regulate groundwater production to: control subsidence, prevent or lessen interference between wells, prevent degradation of groundwater, or prevent waste. Mr. Thornhill provided extensive testimony on the hydrological effect of the GPU Rule. His Supplemental Affidavit goes into detail as to how the GPU Rule is not related to or reasonably calculated to advance the District's statutory purposes. ROA.3015-ROA.3017. Mr. Thornhill's testimony on the subject of the GPU Rule's failure to meet its statutory purposes has remained consistent for years, as reflected in the transcript of the hearing on Larsen's request for a variance from the GPU Rule. ROA.2399-ROA.2418. The district court apparently did not find Thornhill's explanation persuasive, but at the summary judgment stage the court's subjective opinion regarding the weight of Thornhill's testimony should be of no consequence. The existence of that testimony is sufficient to entitle Larsen to a full trial.

There was at least some evidence that the district's procedures were insufficient and resulted in fundamental unfairness to Larsen. The district court's analysis of the substantive due process issue consisted of a summary conclusion that "Plaintiffs cannot seriously claim that the District's rules are conscious shocking." As noted above, the district court made no attempt to address the allegation that BLF's substantive due process rights were harmed by the District's attempt to assess

a penalty that was disproportionate to harm allegedly caused by Larsen's over pumping in certain (but not all) of its GPUs.

The district court failed to appropriately address Larsen's substantive and procedural due process claims, and summary judgment on those claims was in error where at least some evidence existed to support Larsen's right to relief.

## X.  CONCLUSION AND PRAYER

The district court's judgment rests on an overly expansive interpretation of a groundwater conservation district's limited powers and the improper weighing of evidence at the summary judgment stage.  Genuine issues of material fact pervade the record as to Larsen's *ultra vires* and constitutional claims. Accordingly, Larsen requests that the Court reverse the district court's grant of Summary Judgment in favor of NPGCD and resulting final judgment, and that this case be remanded for a full trial.

Respectfully Submitted,

/s/ *Marvin W. Jones*
Marvin W. Jones, SBN 10929100
C. Brantley Jones; SBN: 24079808
SPROUSE SHRADER SMITH PLLC
P.O. Box 15008
Amarillo, Texas 79105-5008
(806) 468-3300 phone
(806) 373-3454 fax
marty.jones@sprouselaw.com
brantley.jones@sprouselaw.com
**Attorneys for Appellants, BLF Land, Inc.
and Blaine Larsen Farms, Inc.**

## XI.    <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 19, 2025, a copy of the foregoing has been served upon counsel for all parties to this proceeding as identified below through the court's electronic filing system as follows:

KEMP SMITH LLP
Deborah C. Trejo; deborah.trejo@kempsmith.com
2905 San Gabriel St., Suite 205
Austin, Texas 78705

Ancel E. Escobar; ancel.escobar@kempsmith.com
Rachel C. Moreno; rachel.moreno@kempsmith.com
221 N. Kansas, Ste 1700
El Paso, Texas 79901

UNDERWOOD LAW FIRM, PC
Thomas C. Riney; tom.riney@uwlaw.com
C. Jason Fenton; jason.fenton@uwlaw.com
500 S. Taylor, Suite 1200 (79101)
P.O. Box 9158
Amarillo, Texas 79158

/s/ *Marvin W. Jones*
Marvin W. Jones
Attorney of Record for Appellants

## XII.   <u>CERTIFICATE OF COMPLIANCE</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements


1.    This brief complies with the type-volume limit of Fed. R. App. P. *32(a)(7)(B)*, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[x]   this document contains [10,524] words, **or**

☐   this brief uses a monospaced typeface and contains [*state the number of*] lines of text.


2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

[x]   this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO (Version 2507 Build 16.0.19029.20136) in Times New Roman Font, **or**

☐   this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].


/s/ *Marvin W. Jones*
Marvin W. Jones
Attorney of Record for Appellants
Dated: August 19, 2025